COEUR D'ALENE TRIBE, Kootenai Tribe of Idaho, and Nez Perce Tribe, Plaintiffs,

v.

STATE of Idaho, Defendant.

Civ. No. 92–0437–N.

United States District Court, D. Idaho.

Jan. 27, 1994.

Raymond C. Givens, Givens Funke & Work, Coeur d'Alene, ID, for plaintiff Coeur d'Alene Tribe.

Robert C. Huntley, Jr., Givens Pursley & Huntley, Boise, ID, Leroy W. Wilder, Hobbs Straus Dean & Wilder, Portland, OR, for plaintiff Kootenai Tribe.

Douglas Nash, Lapwai, ID, for plaintiff Nez Perce Tribe.

Larry Echohawk, Atty. Gen. State of Idaho, David G. High, Chief of Civ. Litigation, Francis P. Walker, Deputy Atty. Gen., Boise, ID, for defendant State of Idaho.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

RYAN, Senior District Judge.

### I. FACTS AND PROCEDURE

Plaintiffs in the above-entitled action, the Coeur d'Alene, Nez Perce, and Kootenai Indian tribes ("the Tribes") are federally-recognized Indian tribes having tribal lands within the State of Idaho. Defendant in this matter is the State of Idaho ("the State" or "Idaho"). The Tribes and the State seek a declaratory judgment regarding their respective rights and obligations under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et seq.* ("IGRA"). The case has been submitted to the court for disposition on cross-motions for summary judgment. These motions have been fully briefed and a hearing was held on December 16, 1993.

Briefly, the facts of the case are as follows.[1] Since 1989, Idaho has operated a state lottery as a means of raising funds for public buildings and schools. The State also licenses and regulates pari-mutuel betting on horse, mule, and dog races pursuant to state law. The present dispute between the Tribes and the State arises over the extent and types of gaming activities which the Tribes may conduct on their respective reservations. Economic conditions on the reservations are such that tribal leaders seek additional governmental revenue and employment for tribal members through Class III gaming.[2]

Pursuant to 25 U.S.C. § 2710(d)(3), the Coeur d'Alene Tribe asked the State on April 15, 1992, to enter into negotiations for the purpose of entering into a tribal-state compact governing Class III gaming activities on the Coeur d'Alene Reservation. The Kootenai and Nez Perce Tribes requested such negotiations with the State on June 8, 1992, and July 22, 1992, respectively. During the summer of 1992, Idaho called a special session of its legislature, enacted legislation, and drafted a proposed constitutional amendment changing Idaho law regarding gaming. The Tribes contend that these actions were taken to prevent them from conducting certain Class III gaming activities on their reservations.

Prior to 1988, Article III, Section 20 of the Idaho Constitution provided as follows: "The legislature shall not authorize any lottery or gift enterprise under any pretense or for any purpose whatever." Idaho Const. art. III, § 20 (amended 1988 and 1992). This provision was in effect until the late 1980s when certain groups within the State pushed for a change in Idaho law so that the State could operate a lottery. This movement culminated in 1988, when Idaho voters passed an amendment to Section 20. The 1988 amended version of Article III, Section 20 provided as follows:

Gambling not to be authorized.—No game of chance, lottery, gift enterprise or gam-

---

1. The following summary of the facts is based on the statements of undisputed facts submitted by the parties, and on certain undisputed facts gleaned from the record.

2. As discussed more fully below, IGRA divides gaming into three categories: Class I, Class II, and Class III. *See* 25 U.S.C. § 2703(6), –(7) and –(8).

bling shall be authorized under any pretense or for any purpose whatever, except for the following:

a. A state lottery which is authorized by the state if conducted in conformity with law; and

b. Pari-mutuel betting if conducted in conformity with law; and

c. Charitable games of chance which are operated by qualified charitable organizations in the pursuit of charitable purposes if conducted in conformity with law.

Idaho Const. art. III, § 20 (amended 1992). This provision was again amended by the voters of Idaho in November of 1992. Thus, the provision now reads as follows:

Gambling Prohibited.—(1) Gambling is contrary to public policy and is strictly prohibited except for the following:

a. A state lottery which is authorized by the state if conducted in conformity with enabling legislation; and

b. Pari-mutuel betting if conducted in conformity with enabling legislation; and

c. Bingo and raffle games that are operated by qualified charitable organizations in the pursuit of charitable purposes if conducted in conformity with enabling legislation.

(2) No activities permitted by subsection (1) shall employ any form of casino gambling including, but not limited to, blackjack, craps, roulette, poker, bacarrat [baccarat], keno and slot machines, or employ any electronic or electromechanical imitation or simulation of any form of casino gambling.

(3) The legislature shall provide by law penalties for violations of this section.

Idaho Const. art. III, § 20(1)–(3).

The Idaho criminal statutes regarding gambling were also changed in 1992. Former Idaho Code § 18–3801 provided as follows:

18–3801. Gambling.—Every person who deals, plays or carries on, opens or causes to be opened, or who conducts, either as owner, employee, or lessee, whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noir,

rondo, Indian stick game, or any game played with cards, dice or any other device for money, checks, credit or any other representative of values, is guilty of a misdemeanor and is punishable by fine not less than $200 nor more than $1,000 or imprisonment in the county jail not less than two (2) months nor more than twelve (12) months or both such fine and imprisonment.

Idaho Code § 18–3801 (1972) (amended 1992).

Idaho Code §§ 18–3801 and –3802 now provide as follows:

18–3801. Gambling defined.—"Gambling" means risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance, the operation of a gambling device or the happening or outcome of an event, including a sporting event, the operation of casino gambling including, but not limited to, blackjack, craps, roulette, poker, bacarrat [baccarat] or keno, but does not include:

(1) Bona fide contests of skill, speed, strength or endurance in which awards are made only to entrants or the owners of entrants; or

(2) Bona fide business transactions which are valid under the law of contracts; or

(3) Games that award only additional play; or

(4) Merchant promotional contests and drawings conducted incidentally to bona fide nongaming business operations, if prizes are awarded without consideration being charged to participants; or

(5) Other acts or transactions now or hereafter expressly authorized by law.

18–3802. Gambling prohibited.—(1) A person is guilty of gambling if he:

(a) Participates in gambling; or

(b) Knowingly permits any gambling to be played, conducted or dealt upon or in any real or personal property owned, rented, or under the control of the actor, whether in whole or in part.

(2) Gambling is a misdemeanor.

Idaho Code §§ 18–3801 and 18–3802 (Supp. 1993).

After the voters passed the final amendment to Article III, Section 20 on November 3, 1992, the Nez Perce Tribe brought suit challenging that amendment on the grounds that the State failed to set forth an adequate and truthful statement of the purpose of the proposed amendment on the ballot as required under Idaho law. In a recent decision, the Idaho Supreme Court upheld the amendment, declaring that the statement of purpose placed on the ballot was sufficient and that the amendment was properly presented for voter approval on the November 3, 1992, election ballot. *See Nez Perce Tribe v. Cenarrusa*, No. 20281, — Idaho ——, 867 P.2d 911 (1993).

After numerous negotiation sessions, the Coeur d'Alene Tribe and the State entered into a partial compact in December of 1992, covering all matters which could be agreed upon. No compacts have been entered into between the State and the Kootenai and Nez Perce Tribes. The present suit was filed because negotiations between the State and all three Tribes have reached an impasse regarding Class III gaming. The Tribes have expressed their intent to engage in extensive Class III gaming activities, including casino-style gambling, which the State contends are prohibited under Idaho law and public policy. Since negotiations began, the State has taken the position that it is only required to negotiate Class III activities permitted under Idaho law. Thus, the State has agreed to negotiate only as to a lottery and pari-mutuel betting on horse, mule, and dog races.

Each of the Tribes has filed a separate complaint in the action, but they have filed a joint motion for summary judgment supported by joint memoranda. In their complaints, the Tribes claim that the State has violated IGRA by refusing to negotiate Class III games, by attempting to prevent the

Tribes from conducting Class III games, by attempting to impose restrictions on Indian gaming greater than those imposed upon its own lottery and racing commissions, and by attempting to give retroactive effect to changes in state law made after the requests for negotiations were made by the Tribes. The Tribes also allege that the State cannot conduct its lottery on reservation lands without a tribal ordinance or resolution and a tribal-state compact authorizing the State to do so.

■■■ The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1362.[3] The State has consented to this suit and has waived any objection to jurisdiction based on immunity from suit under the Eleventh Amendment to the United States Constitution. In addition, the dispute between the parties arising from the negotiation of gaming compacts is an actual controversy warranting declaratory relief. *See Oneida Tribe of Indians v. Wisconsin*, 951 F.2d 757, 759 (7th Cir.1991).

## II. ANALYSIS

### A. The Summary Judgment Standard

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*,

**3.** Title 28 U.S.C. § 1362 provides that "[t]he district courts shall have original jurisdiction of all civil actions brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C.S. § 1362 (Law.Co-op.1988). It is undisputed that the Tribes are federally recognized Indian tribes within the meaning of IGRA. *See* 25 U.S.C. § 2703(5).

477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to make such a showing on any essential element of his case, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.[4]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be *both* "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975) (*quoting First Nat'l Bank v. Cities Serv. Co., Inc.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). The Ninth Circuit cases are in accord. *See e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371 (9th Cir.1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

The parties agree that there are no disputed issues of material fact and that this matter may be resolved by summary judgment.

---

4. *See also* Rule 56(e), which provides in part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule,

**B.** *Pending Motions for Summary Judgment*

1. *Issues.*

Resolution of this dispute turns on the following issue: The Tribes contend that because Idaho permits and/or does not prohibit certain forms of Class III gaming, the Tribes are free to conduct any and all forms of Class III gaming, including casino gambling, on their reservations. Idaho contends that the Tribes may conduct only those specific forms of Class III gaming which are permitted and/or are not prohibited under the law and public policy of the State.

The Tribes have asked the court to enter a declaratory judgment as to the following specific issues:

1. Does IGRA impose any restriction on the type of Class III gaming the Tribes may conduct in light of Idaho's gaming scheme?

2. In examining the Idaho gaming scheme under IGRA, should the court use the present Idaho gaming scheme or the scheme in effect in April 1992 when the IGRA gaming compact negotiations were initiated?

3. Under IGRA can a state insist upon restrictions which limit the opportunity for the economic self-sufficiency of a Tribe?

4. Under IGRA can a state conduct its own lottery on Indian lands without a compact with that Tribe?

*See* Mem.Supp.Pls.' Mot. for Summ.J., filed June 25, 1994, at 1.

2. *Introduction to IGRA and Indian Gaming.*

When Congress enacted IGRA in 1988, it made the following findings:

(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

---

must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

. . . .

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and *is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.*

25 U.S.C.S. § 2701 (Law.Co-op.1983 & Supp. 1993) (emphasis added).[5]

IGRA divides gaming into three categories. Class I includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." *Id.* § 2703(6). Class I gaming is under the exclusive jurisdiction of Indian tribes and is not subject to the regulatory provisions of IGRA. 25 U.S.C. § 2710(a)(1).

Class II gaming is defined as

the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith) . . . including, (if played in the same location) pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and . . . card games that (I) are explicitly authorized by the laws of the State, or (II) are not explicitly prohibited by the laws of the State and are played at any location in the State, but only if such card games are played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games.

25 U.S.C.S. § 2703(7)(A)(i)(III), –(ii) (Law. Co-op.1983 & Supp.1993). Class II gaming does not include "any banking card games, including baccarat, chemin de fer, or blackjack (21), or . . . electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." *Id.* § 2703(7)(B). Indian tribes have jurisdiction over Class II gaming, subject to the requirements of IGRA and the oversight of the National Indian Gaming Commission. 25 U.S.C. § 2710(b).

Class III gaming includes all forms of gaming that are not Class I or Class II gaming. 25 U.S.C. § 2703(8). Only Class III gaming is at issue in this case. Although the Tribes have not listed the specific games they wish to conduct, they have made it clear that they intend to operate casinos on their reservations. Therefore, the court will assume that the Tribes intend to conduct card and dice games, baccarat, roulette, keno and slot machines, and all other traditional forms of casino gambling, or the electronic or electromechanical equivalent thereof.

With respect to Class III gaming, IGRA provides as follows:

Class III gaming activities shall be lawful on Indian lands only if such activities are . . . authorized by [tribal] ordinance or resolution . . . located in a State that permits such gaming for any purpose by any person, organization, or entity, and . . . conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State. . . .

25 U.S.C.S. § 2710(d)(1) (Law.Co-op.1983 & Supp.1993). IGRA requires that, prior to engaging in Class III gaming, a compact covering such gaming must be negotiated and agreed upon by the Indian tribe and the state in which the tribal lands are located. 25 U.S.C. § 2710(d)(3)(A). The compact

---

**5.** After setting forth the preceding findings, Congress then explained the purposes of IGRA:

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;
(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to

shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players. . . .

25 U.S.C.S. § 2702 (Law.Co-op.1983 & Supp. 1993).

must then be approved by the Secretary of Interior. 25 U.S.C. § 2710(d)(3)(B).

### 3. *Background of IGRA—The Cabazon Decision and Legislative History.*

Prior to enactment of IGRA, the United States Supreme Court handed down its decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). The *Cabazon* case set the standard for resolving disputes between Indian tribes and states regarding gaming on tribal lands. In *Cabazon*, California sought to impose state restrictions on the Indian tribes' bingo operations and to prohibit the playing of draw poker and other card games on the reservation. *Id.* at 205–06, 107 S.Ct. at 1086. The tribes brought suit seeking a declaratory judgment that the state had no authority to apply its gaming laws inside the reservation.

■ In its decision, the Supreme Court first noted that Indian tribes retain the attributes of sovereignty over their members and lands. *Id.* at 207, 107 S.Ct. at 1087. Such sovereignty is subordinate only to the federal government and not to the states. *Id.* The Court then explained that if Congress expressly provides, state laws can be applied on reservations. California argued that Congress had done just that in Public Law 280, enacted in 1953, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162 (1970) and 28 U.S.C. § 1360 (1984)). The Court disagreed, pointing out that while Public Law 280 granted broad criminal jurisdiction over offenses committed by or against Indians within the reservations, the statute's grant of civil jurisdiction was much more limited. *California v. Cabazon Band of Mission Indians*, 480 U.S. at 207, 107 S.Ct. at 1087. The Court noted that in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), it had held that while Public Law 280 granted states jurisdiction over private civil litigation involving reservation Indians in state court, it did not convey general civil regulatory authority. *Cabazon*, 480 U.S. at 208, 107 S.Ct. at 1088. The Court then declared:

> We recognized [in *Bryan* ] that a grant to States of general civil regulatory power over Indian reservations would result in the destruction of tribal institutions and values. Accordingly, when a State seeks to enforce a law within an Indian reservation under the authority of Pub L 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation ... or civil in nature, and applicable only as it may be relevant to private civil litigation in state court.

*Id.*

The Court then noted the distinction between state "criminal/prohibitory" laws and state "civil/regulatory" laws, describing the distinction as follows:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub L 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub L 280 does not authorize its enforcement on an Indian reservation. *The shorthand test is whether the conduct at issue violates the State's public policy.*

*Id.* at 209, 107 S.Ct. at 1088 (emphasis added). The Court also declared that although "an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it to a criminal law...." *Id.* at 211, 107 S.Ct. at 1089.

The Supreme Court then carefully reviewed California gambling laws and concluded that "California regulates rather than prohibits gambling in general and bingo in particular." *Id.* The Court ultimately held that because California only regulated non-Indian bingo and card-playing operations, the tribes were free to engage in those particular gaming activities and were not required to adhere to state regulations regarding such activities.

The *Cabazon* decision is noted in the legislative history of IGRA and is incorporated in the final statutory language of the Act. The Senate Report discussing the requirement that Class II gaming on Indian lands be allowed only if "located within a State that permits such gaming for any purpose by any person, organization or entity," 25 U.S.C.S. § 2710(b)(1)(A) (Law.Co-op.1983 & Supp.

1993), refers expressly to the *Cabazon* decision.

> [T]he Committee anticipates that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. This distinction has been discussed by the Federal courts many times, most recently and notably by the Supreme Court in *Cabazon*.

> \* \* \* \* \* \*

> The phrase "for any purpose by any person, organization or entity" makes no distinction between State laws that allow class II gaming for charitable, commercial, or governmental purposes, or the nature of the entity conducting the gaming. *If such gaming is not criminally prohibited by the State in which tribes are located, then tribes, as governments, are free to engage in such gaming.*

*See* Mem.Supp.Pls.' Mot for Summ.J., filed June 25, 1993, App. Part I, Ex. A2 (S.Rep. No. 446, 100th Cong., 2d Sess.) at A–6 and A–12. (emphasis added).[6]

The *Cabazon* decision does not address the situation confronting the court in the present action. Nevertheless, it is clear that the prohibitory/regulatory analysis contained in *Cabazon* must guide the court in resolving this dispute. Therefore, the court must evaluate Idaho law and public policy on gambling.

4. *Which Idaho Law Applies?*

■ The Tribes argue that the court must assess Idaho law and public policy as it was in the spring and summer of 1992, when the Tribes first requested negotiations on Class III gaming. The State contends that the laws now in effect should govern the compact negotiations. The Tribes base their argument on the following grounds: (1) IGRA

does not allow a state to restrict Indian gaming by modifying its laws; (2) retroactive application of changes in state law cannot be allowed to deprive the Tribes of vested rights; and (3) the constitutional amendment ratified by the voters in 1992 is invalid because it was not adopted in accordance with Idaho law. The court need not address this third point because the Idaho Supreme Court has now upheld the amendment, and this court will defer to the findings and judgment of the Idaho Supreme Court as to the legality of the 1992 amendment process.

The Tribes contend that "Congress, in enacting IGRA, did not grant states authority to restrict Indian gaming by modifying [their] laws." Mem.Supp.Pls.' Mot. for Summ.J., filed June 25, 1993, at 27. The Tribes offer no authority to support their claim that IGRA precludes a state from changing its gaming laws prior to entering into a compact. IGRA is entirely silent on this issue. It appears that the basis of Tribes' argument is their feeling that the State has acted in an unfair and underhanded manner in changing its laws in the summer and fall of 1992.

The Tribes contend that they have been singled out for unfair treatment. The court does not agree. The 1992 changes in Idaho law apply equally to the State, to the Tribes, and to all other groups and individuals. The changes were made to make clear that only a lottery, pari-mutuel betting, and bingo and raffle games are permitted in Idaho. All other forms of gambling are expressly prohibited to everyone, including both the State and the Tribes. It would be a much different question if Idaho had attempted to create a situation in which the State alone could engage in casino gambling and all other groups, including Indian tribes, could not. However, this is not the case. In fact, such a situation could never occur. Under IGRA, if the State were to engage in casino gambling, or permit any group or entity to do so, the Tribes could

---

**6.** Although the Senate Report addresses the phrase found in 25 U.S.C. § 2710(b)(1)(A), the identical phrase is used in Section 2710(d)(1)(B), and therefore, also applies to Class III gaming. *See Mashantucket Pequot Tribe v. Connecticut,* 913 F.2d 1024, 1030 (2d Cir.1990). "It is a settled principle of statutory construction that '[w]hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place.' " *Id.* (citations omitted).

also engage in casino gambling. *See* 25 U.S.C. § 2710(d)(1)(B).

Under IGRA, the law and public policy of the state set the scope of permissible Class III gaming on tribal lands. IGRA certainly does not command that a state may not change its gaming laws or amend its constitution prior to entering into a compact. There is nothing in IGRA which would prevent Idaho from abolishing and criminally prohibiting *all* Class III gaming entirely.

The Tribes also contend that the State could not change its gaming laws after compact negotiations were requested because to do so would deprive them of vested rights. The Tribes have not argued this point clearly, but it appears that their position is as follows. At the time the Tribes requested compact negotiations, they acquired a vested right to conduct any and all Class III gaming permitted under Idaho law at that time. Thus, the Tribes contend that to resolve this dispute under Idaho law as it now stands would mean giving retroactive effect to the 1992 changes in the law, depriving the Tribes of a vested right.[7]

The court is not persuaded that the Tribes had any vested rights with respect to particular Class III gaming activities. First, as noted above, there is nothing in IGRA which precludes a state from changing its gaming laws and negotiating compacts accordingly. Second, IGRA does not provide that an Indian tribe acquires rights of any kind at the moment compact negotiations are requested. On the contrary, IGRA makes it clear that the Tribes have no right, vested or inchoate, to conduct Class III games until a compact has been negotiated with the state. *See* 25 U.S.C. § 2710(d)(1)(C). Therefore, the only time an Indian tribe could arguably claim a vested right to conduct a particular form of Class III gaming would be after a compact between the tribe and state addressing the particular form of gaming had been entered into and finally approved.

In summary, the court finds that the proper scope of compact negotiations shall be determined by looking to Idaho law and public policy as they now stand, rather than reverting to Idaho law as it was at the time the Tribes first requested compact negotiations.

### 5. *Scope of Negotiations.*

■ The State maintains that it is only required to negotiate with the Tribes with respect to the specific Class III gaming activities which are permitted under Idaho law. The Tribes contend that because Idaho permits some forms of Class III gaming, its policy toward Class III gaming as a class is regulatory rather than prohibitory, and therefore, the Tribes are free to engage in *all* forms of Class III gaming, including casino gambling and keno and slot machines, and the State must negotiate accordingly. In the words of counsel for the Tribes:

> Since IGRA was passed, several federal courts have ruled on the issues present in this case. They uniformly follow the *Cabazon* rule, holding that a state "permits" a gaming activity if it has a public policy promoting that gaming activity. Thus, the games "permitted" within a state for IGRA purposes need not be limited to only those games presently operated by that state.

Mem.Supp.Pls.' Mot. for Summ.J., filed June 25, 1993, at 20.

The Tribes rely primarily on four cases: *United States v. Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358 (8th Cir.1990); *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024 (2d Cir.1990), *cert. denied*, 499 U.S. 975, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 770 F.Supp. 480 (W.D.Wis.1991); and *Ysleta Del Sur Pueblo v. Texas*, No. P–93–CA–29 (W.D.Tex.1993). The court has thoroughly reviewed these cases, as well as all of the other cases, both pre-IGRA and post-IGRA, which have addressed the scope of permissible gaming on Indian reservations. Upon this review, the court finds that all of the cases uniformly support the position taken by the State.

---

7. The Tribes also speak of their vested right of self-government and tie that to their right to conduct gaming subject only to the limitations of IGRA. The court certainly recognizes the right of the Tribes to self-government and to conduct their own affairs on their reservations. However, the question of what the limitations of IGRA are is at the heart of this dispute.

All of the courts have followed the regulatory/prohibitory distinction established by the Supreme Court in *Cabazon.* In the four cases relied on by the Tribes, the courts conducted a broad review of the laws and public policy of each state and concluded that the *specific* gaming activity at issue was permitted by the particular state.

In *United States v. Sisseton–Wahpeton Sioux Tribe,* 897 F.2d 358 (8th Cir.1990), the Indian tribe established a blackjack operation on its reservation in South Dakota on April 15, 1988. *Id.* at 359. The same day the tribe opened its blackjack operation, it filed a complaint in district court seeking a declaration of its legal right to run the operation. *Id.* IGRA then became effective on October 17, 1988. IGRA contains a grandfather clause which accords Class II treatment to card games already in existence at the time of enactment.[8] The Eighth Circuit Court of Appeals held that the tribe had not altered the nature and scope of its blackjack operation since May 1, 1988, and that the operation would therefore be classified as Class II gaming because of the grandfather provision. *Id.* at 363.

The Eighth Circuit then reviewed the district court's holding that the blackjack operation was unlawful, even if classified as Class II gaming, because it was not conducted in compliance with wage limits and other requirements set by South Dakota law. That case, like the case at hand, turned on the proper interpretation of the phrase "permits such gaming for any purpose by any person, organization or entity." 25 U.S.C.S. § 2710(d)(1) (Law.Co-op.1983 & Supp.1993). The Eighth Circuit addressed the case by focusing on the *particular gaming activity*—blackjack. The court did not hold that the case turned on whether or not a particular *class* of gaming was permitted by the state. "[W]e believe that the legislative history reveals that Congress intended to permit a *particular gaming activity,* even if conducted

in a manner inconsistent with state law, if the state merely regulated, as opposed to completely barred, *that particular gaming activity.*" *United States v. Sisseton–Wahpeton Sioux Tribe,* 897 F.2d at 365 (emphasis added).

The court went on to hold that because South Dakota permitted commercial card games, including blackjack, the Indian tribe could also conduct a blackjack operation. This decision is entirely consistent with the position advanced by Idaho in the case at hand. Idaho asks the court to focus not on whether Class III gaming as a *class* is permitted in Idaho, but rather on what *particular Class III gaming activities* are permitted under Idaho law, and compare that to the particular gaming activities sought to be conducted by the Tribes.

In *Mashantucket Pequot Tribe v. Connecticut,* 913 F.2d 1024 (2d Cir.1990), *cert. denied,* 499 U.S. 975, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991), the Indian tribe sought to conduct casino-type gaming activities on its reservation and the state refused to negotiate a compact regarding such activities. *Id.* at 1025. The court reviewed Connecticut law and noted that Connecticut allowed non-profit charitable organizations to conduct casino gambling on so-called "Las Vegas Nights" for charitable purposes. In light of 25 U.S.C. § 2710(d)(1)(B), the court ruled that the state was required to negotiate with the tribe regarding the conduct of casino-type games of chance because the state permitted other organizations and entities to engage in such activities. *Id.* at 1032. The state would not have had to negotiate casino-type gaming had it prohibited such gaming to *all* persons, organizations, and entities within the state.

In *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin,* 770 F.Supp. 480 (W.D.Wis.1991) (hereafter *"Lac du Flambeau II"*), Indian tribes and the State of Wisconsin disagreed over whether the state was required to include casino

---

8. Notwithstanding any other provision of this paragraph, the term "class II gaming" *includes* those card games played in the State of Michigan, the State of North Dakota, *the State of South Dakota,* or the State of Washington, that were actually operated in such State by an Indian tribe *on or before May 1, 1988,* but only

to the extent of the nature and scope of the card games that were actually operated by an Indian tribe in such State on or before such date....

25 U.S.C.S. § 2703(7)(C) (Law.Co-op.1983 & Supp.1993) (emphasis added).

games, video games, and slot machines in its negotiations with the tribes. *Id.* at 482. The state constitution was amended in 1987. As amended, the constitution authorized a state lottery and pari-mutuel betting and did not prohibit other forms of gaming involving the elements of prize, chance, and consideration. *Id.* at 486. Thus, the court concluded that "the state is required to negotiate with plaintiffs over the inclusion in a tribal-state compact of any activity that includes the elements of prize, chance and consideration and *that is not prohibited expressly by the Wisconsin Constitution or state law.*" *Id.* at 488 (emphasis added). Given the broad definition of lottery and the fact that Wisconsin law no longer had any express prohibition against games involving the elements of prize, chance, and consideration, Wisconsin was required to negotiate regarding the games proposed by the tribes.

At least one other court has noted that the court in *Lac du Flambeau II* took a more expansive view of the *Cabazon* decision than had previous courts, and declined to follow *Lac du Flambeau II:*

> To some extent, the court in *Lac du Flambeau II* utilized a different interpretation of *Cabazon.* . . . For example, the court observed:
>
>> If the policy is to prohibit all forms of gambling by anyone, then the policy is characterized as criminal-prohibitory and the state's criminal laws apply to tribal gaming activity. On the other hand, if the state allows some forms of gambling, even subject to extensive regulation, its policy is deemed to be civil-regulatory and it is barred from enforcing its gambling laws on the reservation.
>
> This approach is broader than the one employed by the Supreme Court in *Cabazon* and other courts which have faced the same question and, to the extent the court in *Lac du Flambeau II* based its conclusion on that analysis, we decline to follow its lead.

*Seminole Tribe of Florida v. Florida,* No. 91–6756–CIV–MARCUS, 1993 WL 475999, Order at 15–16 (S.D.Fla. Sept. 22, 1993) (*quoting Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin,*

770 F.Supp. at 485) (footnote omitted). The court in *Seminole Tribe of Florida* went on to declare that:

> [T]he thrust of *Cabazon* and its progeny requires a *particularized inquiry into the proposed gambling activity* (in this case, casino gambling and machine or computer-assisted gaming). For example, in *Cabazon,* where California ran a state lottery and permitted parimutuel betting, the lower courts and the Supreme Court looked at the state's public policy regarding bingo, *the specific gambling activity at issue.* Thus, we do not agree that *Lac du Flambeau II* dictates the outcome of the instant case, without a review of the State's public policy toward gambling in general and its public policy toward *the specific gaming activities in question.*

*Seminole Tribe of Florida v. Florida,* No. 91–6756–CIV–MARCUS, 1993 WL 475999, Order at 16 n. 1 (S.D.Fla. Sept. 22, 1993).

This court agrees with the approach taken by the court in *Seminole Tribe of Florida.* In addition, the *Lac du Flambeau II* case is distinguishable from the case at hand because the Idaho Constitution *expressly prohibits* all forms of casino gambling and/or the electrical or electromechanical imitation or simulation of any form of casino gambling. The constitution also directs the legislature to provide criminal penalties for violation of this prohibition against such gaming.

In the final decision relied on by the Tribes, *Ysleta Del Sur Pueblo v. Texas,* No. P–93–CA–29 (W.D.Tex. Nov. 1, 1993) (Memorandum Opinion & Order), the State of Texas refused to negotiate with the plaintiff Indian tribe regarding casino-type games. The tribe sought to engage in blackjack, roulette, baccarat, craps, and slot machines, including electronic and electromechanical games of chance. *Id.* at 15. The court noted that Texas allowed bingo, pari-mutuel betting on horse and dog races, charitable raffles, the state lottery, mechanical games of chance so long as the reward is a non-cash prize of no more than $5.00, wagers on carnival contests so long as the prize is limited to merchandise worth less than $25.00, and private social gambling if conducted in private with even chances and risks and no bank. The court

then held that Texas no longer had a broad public policy against gambling. *Id.* at 13.

The term "lottery" is broadly defined in Texas. *See* Tex.Rev.Stat.Ann. art. 179g, § 1.02(3) (Vernon Supp.1992), *quoted in Ysleta Del Sur Pueblo v. Texas,* No. P–93–CA–29, (W.D.Tex. Nov. 1, 1993) Mem.Op. & Ord. at 16. Although Texas could authorize casino gambling under its broad definition of lottery, it argued that the Indian tribe could not engage in casino gambling because such gambling was not actually played or allowed in Texas. The court pointed out that the proper focus was on whether Texas permitted such gaming by any person, organization, or entity. The court agreed with the decision in *Seminole Tribe of Florida,* declaring that "just because the state allows *some types* of Class III gaming to occur the state is not required to engage in negotiations over *all types* of Class III gaming activities." *Ysleta Del Sur Pueblo v. Texas,* No. P–93–CA–29, (W.D.Tex. Nov. 1, 1993), Mem.Op. & Ord. at 17–18 (emphasis added).

The court then noted that the only restriction in Texas law as to the operation of the state lottery was that the State Lottery Act only excluded "video forms of casino games, not the live or other non-video electronic games." *Id.* at 18. The court also found that a limited form of casino-type gaming could occur under what it referred to as the "carnival exception," and that charitable organizations could also use this exception. *Id.* at 19. The court then concluded as follows:

> Because casino gaming is permitted by some persons and individuals under the carnival exception, and based on the definition of "lottery" in the Texas Lottery Act allowing games which include chance, prize, and consideration, the Court is of the opinion that the casino games requested by the Tribe should be included in the negotiations of a Tribal–State Compact under the IGRA.

*Id.* at 20.

Again, the Texas case is distinguishable from the case at hand because the Idaho Constitution expressly prohibits the state lottery commission (and all others) from employing any form of casino gambling, or from employing any form of electrical or electro-mechanical imitation or simulation of any form of casino gambling. In addition, there is no "carnival exception" in Idaho, nor does Idaho permit charitable "Las Vegas Nights."

The court in *Ysleta Del Sur Pueblo* concurred with the position now advanced by Idaho—that just because the State permits *some* forms of Class III gaming, does not mean that it must negotiate as to *all* forms of Class III gaming. Other recent federal court decisions also agree with this position. In *Seminole Tribe of Florida,* the court, after reviewing the same cases discussed above, held as follows:

> In sum, we can find no convincing support in these cases for the Tribe's suggestion that a state's public policy permitting individual Class III activities is somehow equivalent to permitting all Class III gaming activities. Indeed, two other courts recently reached the same conclusion regarding the 'permits such gaming' language and Class III gaming activities.

*Seminole Tribe of Florida v. Florida,* No. 91–6756–CIV–MARCUS, 1993 WL 475999 (S.D.Fla. Sept. 22, 1993) Ord. at 16.

The Florida court was referring to the decisions in *Cheyenne River Sioux Tribe v. South Dakota,* 3 F.3d 273 (8th Cir.1993); and *Rumsey Indian Rancheria v. Wilson,* No. CIV–S–92–812–GEB, 1993 WL 360652 (E.D.Calif. July 16, 1993). In *Cheyenne River,* the court noted that since 1989 South Dakota had allowed state lotteries, video lotteries, limited card games, pari-mutuel horse and dog racing, and simulcasting. *Cheyenne River Sioux Tribe v. South Dakota,* 3 F.3d at 276. An important part of the dispute centered around the tribe's proposal to conduct traditional keno games on its reservation. South Dakota law permitted only video keno games to be conducted. Therefore, the state refused to include traditional keno gaming in the compact negotiations. In resolving this dispute, the Eighth Circuit Court of Appeals held as follows:

> We agree with the state that it need not negotiate traditional keno if only video keno is permitted in South Dakota. The "such gaming" language of 25 U.S.C. § 2710(d)(1)(B) does not require the state

to negotiate with respect to forms of gaming it does not presently permit. Because video keno and traditional keno are not the same and video keno is the only form of keno allowed under state law, it would be illegal, in addition to being unfair to the other tribes, for the tribe to offer traditional keno to its patrons. Therefore, we agree with the district court that the state did not refuse to negotiate in good faith on the tribe's operation of traditional keno. *Id.* at 279.[9]

*Rumsey Indian Rancheria v. Wilson* is also in accord with the position advanced by Idaho:

At the outset, the court must decide whether, under the IGRA and *Cabazon* Class III games are considered collectively or individually when determining whether they are an appropriate subject of a Tribal–State compact. Plaintiffs argue that if California permits *any* Class III games to be played, all Class III games should be negotiable in a Tribal–State compact. The State contends that Class III is "less a category than a residuum" and urges an activity by activity analysis. Class III includes a wide variety of games and legislative history and prior cases demonstrate that the "activity" is not to be too narrowly defined. Courts which have applied the *Cabazon* prohibitory/regulatory distinction have conducted a broad review of the state's gaming laws but are careful to examine the specific gaming activity which has been proposed.... This court has found no authority for the proposition that a state's public policy construed as permitting a single Class III game must be found to permit all Class III gaming activities. Accordingly, this court adopts the method of review used by other courts....

*Rumsey Indian Rancheria v. Wilson,* No. CIV–S–92–812–GEB, 1993 WL 360652 (E.D.Calif. July 16, 1993), Ord. on Cross–Mot. for Summ.J., at 15–16 n. 16 (citations omitted).

The Idaho Constitution expressly declares that all gambling is contrary to public policy and is strictly prohibited, except for three carefully limited exceptions: the state lottery, pari-mutuel betting if conducted in conformity with enabling legislation, and bingo and raffle games that are operated by qualified charitable organizations in the pursuit of charitable purposes.[10] In addition, the Idaho Constitution expressly forbids those engaging in the three carefully limited exceptions from employing any form of casino gambling including, but not limited to, blackjack, craps, roulette, poker, baccarat, keno and slot machines, or from employing any electrical or electromechanical imitation or simulation of any form of casino gambling.

The Idaho Constitution further declares that the legislature shall provide for penalties for violation of the prohibition against gambling. Accordingly, Idaho Code § 18–3802 provides that those who engage in gambling (other than participation in the three exceptions allowed under the Idaho Constitution) shall be guilty of a misdemeanor.

Based on the preceding discussion, the court finds that under the combined IGRA and *Cabazon* analysis, the State must negotiate with the Tribes only as to the conduct of a lottery and pari-mutuel betting on horse, mule, and dog races. The State is not required to negotiate as to any other forms of Class III gaming.

6. *Restrictions on Conduct of Tribal Gaming.*

■ The State contends that it may negotiate reasonable restrictions and require-

---

9. The circumstances and holding in the *Cheyenne River* case also apply to a similar dispute between Idaho and the Tribes in the present case. The Tribes argue that because the Idaho lottery uses scratch and pull-tab games with poker and/or other casino gambling themes, they should be allowed to engage in actual casino gambling, offering the same games on which the lottery tickets are based.

The court disagrees. There is a considerable difference between a lottery ticket with a poker theme and a live, banked card game at a casino.

Idaho law clearly prohibits any banked or percentage card games or other forms of casino gambling from being played by any person for any purpose. However, the Tribes may certainly conduct their lotteries in the same fashion as the State.

10. Once permitted under Idaho law, charitable organizations are now prohibited from conducting casino nights or any form of casino gambling.

ments regarding the conduct and operation of tribal gaming in furtherance of the public interest. The Tribes contend that IGRA prohibits the State from imposing restrictions on the scale of operations of allowable games which reduce either the revenue to the Tribes or the potential for economic development. The Tribes refer specifically to "limits on the number of gaming machines and gaming tables as well as limits on the size of prizes and bets." *See* Mem.Supp.Pls.' Mot. for Summ.J., filed June 25, 1993, App. Part II, Ex. F5 (1992 Class III Gaming Compact between the Coeur d'Alene Tribe and the State of Idaho) art. 6, ¶ 6.1.2b.

In light of the court's ruling on the scope of compact negotiations with respect to allowable forms of Class III gaming, this issue appears to be largely moot. Nevertheless, the court notes Section 2710(d)(3)(C) which addresses the subjects that may be raised in the course of compact negotiations.

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C.S. § 2710(d)(3)(C) (Law.Co-op.1983 & Supp.1993).

The Senate Report addressed the compact negotiation process in some detail.

[T]here is no adequate Federal regulatory system in place for class III gaming, nor do tribes have such systems for the regulation of class III gaming currently in place. Thus a logical choice is to make use of existing State regulatory systems, although the adoption of State law is not tantamount to an accession to State jurisdiction. The use of State regulatory systems can be accomplished through negotiated compacts but this is not to say that tribal governments can have no role to play in regulation of class III gaming—many can and will.

The terms of each compact may vary extensively depending on the type of gaming, the location, the previous relationship of the tribe and State, etc. Section 11(d)(3)(C) describes the issues that may be the subject of negotiations between a tribe and a State in reaching a compact. The Committee recognizes that subparts of each of the broad areas may be more inclusive. *For example, licensing issues under clause vi may include agreements on days and hours of operation, wage and pot limits, types of wagers, and size and capacity of the proposed facility.* A compact may allocate most or all of the jurisdictional responsibility to the tribe, to the State or to any variation in between. The Committee does not intend that compacts be used as a subterfuge for imposing State jurisdiction on tribal lands.

The Committee does view the concession to any implicit tribal agreement to the application of State law for class III gaming as unique and does not consider such agreement to be precedent for any other incursion of State law onto Indian lands. Gaming by its very nature is a unique form of economic enterprise and the Committee is strongly opposed to the application of the jurisdictional elections authorized by this bill to any other economic or regulatory issue that may arise between tribes and States in the future.

*See* Mem.Supp.Pls.' Mot. for Summ.J., filed June 25, 1993, App. Part I, Ex. A2 (S.Rep. No. 446, 100th Cong., 2d Sess.) at A–13–14 (emphasis added).

■ The parties have not identified any specific restrictions which the State has attempted to negotiate in compact negotiations. Thus, there is no actual controversy for the court to resolve. Nevertheless, as the statute and Senate Report make clear, Congress intended the parties to negotiate as to the degree and type of State regulation of, and jurisdiction over, gaming on tribal lands. In so doing, Congress recognized that the Tribes have a strong governmental interest in raising revenues to promote tribal economic development and self-sufficiency. Congress also recognized the important state interest in the safe, orderly, and honest conduct of gaming on the reservations. The court expects the parties to negotiate accordingly, "within the context of the mutual benefits that can flow to and from tribe and States." *Id.* at A–13.

### 7. *Operation of the State Lottery on Tribal Lands.*

■ Since 1989, the State has operated its own lottery on the Nez Perce Reservation and actively encouraged its play. As of April 1993, the state lottery had a total of 32 outlets at various locations in the Nez Perce Reservation. It is unclear from the record whether the state lottery is conducted on the Coeur d'Alene and Kootenai Reservations. The Tribes contend that the State may not conduct its lottery on the Nez Perce Reservation in the absence of a tribal ordinance or resolution and a tribal-state compact which authorizes this activity on the reservation. The State contends that 18 U.S.C. § 1166 [11] makes Idaho's lottery laws applicable on Indian reservations.

Congress enacted IGRA in order to provide a framework to guide states and Indian tribes in their efforts to reach agreement both as to the extent of Class III gaming to be conducted on tribal lands and how those activities are to be conducted. The purpose of IGRA, its clear language, and its legislative history make clear that the extent to which state gaming regulations and/or regulatory systems shall apply on Indian reservations is to be carefully negotiated between these sovereign entities through the compact negotiation process.

It is obvious that the state lottery is a Class III gaming activity. IGRA expressly provides that Class III gaming activities shall be *lawful* on Indian lands *only if such activities are* (1) authorized by an ordinance or resolution of the tribe that meets the requirements of the statute and is approved by the commission chairman; (2) located in a state that permits such gaming for any purpose by any person, organization, or entity; and (3) conducted in conformance with a tribal-state compact entered into by the tribe and the state. 25 U.S.C. § 2710(d).

It is undisputed that there is no Nez Perce resolution authorizing Class III gaming on the Nez Perce Reservation, nor is there a compact between the State and the Nez Perce Tribe authorizing such gaming activity. Accordingly, the court finds that in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity, including the State of Idaho, may conduct Class III gaming on the reservation.

### 8. *Summary.*

Based on the preceding discussion, the court summarizes its findings and conclusions as follows. First, *Cabazon* and IGRA clearly restrict gaming on Indian lands to those types of games permitted by the state and/or those games which do not violate the law and public policy of the state. Second, the present law in Idaho, including the 1992 constitutional amendment, controls this court's analysis of what gaming is permitted by Idaho and what gaming is against the law and the public policy of the State.

Third, the legislative history and cases establish that IGRA allows the State to negotiate with the Tribes with respect to such issues as wage and pot limits, days and hours of operation, and capacity of proposed gam-

---

**11.** "Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." 18 U.S.C.S. § 1166(a) (Law.Co-op.1979 & Supp. 1993).

ing facilities. Furthermore, it is clear that a focal point of compact negotiations is the question of the extent to which state regulations and/or a state regulatory system regarding particular gaming activities shall apply on Indian reservations. It is hoped that compact negotiations will lead to the mutual advantage of both the Tribes and the State, and that the public interest and safety, as well as the honesty and integrity of the gaming activities, will be protected.

Fourth, IGRA makes it clear to this court that the State cannot operate its lottery on tribal lands without compacts and tribal ordinances authorizing Class III gaming by this non-tribal entity.

As to the fundamental issue, the court holds that the State is only obligated to negotiate a compact with the Tribes regarding Class III games which are permitted and/or are not prohibited by the laws and public policy of the State. Neither the language of IGRA, the *Cabazon* case on which it is based, the legislative history and statement of purpose of the Act, nor the later federal cases interpreting the Act, can be read to allow the Tribes to conduct casino-type gaming on reservations in Idaho, when the laws and public policy of Idaho are so clearly against such gaming. The State is required to negotiate only as to those Class III gaming activities permitted under state law: a lottery and pari-mutuel betting on horse, mule, and dog races.

The Tribes have expressed their feeling that Idaho seeks to protect its gaming while restricting gaming by the Tribes. This is not the case. The Tribes will be free to conduct the same gaming activities (lottery and pari-mutuel betting) and in the same manner as the State. Furthermore, the Tribes themselves have clearly demonstrated to the court the substantial revenues that can be generated through a lottery such as that run by the State.

### C. *Motion to Strike*

On July 9, 1993, the State filed a Motion to Strike Affidavit of William Thompson. This motion is made on the grounds that the affidavit of Mr. Thompson sets forth legal conclusions regarding the key questions of law raised in this case. The court has reviewed this motion and the memoranda filed by the parties. The court concurs that the affidavit contains improper legal conclusions. The Tribes concede this point, and in their response memorandum they have identified each legal conclusion. Accordingly, the affidavit will be stricken to the extent that it contains legal conclusions.

### III. ORDER

Based on the foregoing, and the court being fully advised in the premises,

IT IS HEREBY ORDERED that the Motion for Summary Judgment, filed June 25, 1993, by the Coeur d'Alene, Nez Perce, and Kootenai Indian Tribes, should be, and is hereby, GRANTED in part, and DENIED in part. The motion is granted in that the State of Idaho may not operate its lottery on the Nez Perce Reservation in the absence of an appropriate tribal-state compact and tribal ordinance. The motion is denied in all other respects.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment, filed June 25, 1993, by the State of Idaho, should be, and is hereby, GRANTED in part, and DENIED in part. The motion is denied in that the State may not operate its lottery on the Nez Perce Reservation in the absence of an appropriate tribal-state compact and tribal ordinance. The motion is granted in all other respects.

IT IS FURTHER ORDERED that, in addition to the summary of the court's findings and conclusions set forth above, the court hereby specifically DECLARES that the State of Idaho is required to negotiate with the plaintiff Tribes only as to those Class III gaming activities permitted under state law: a lottery and pari-mutuel betting on horse, mule, and dog races. Idaho law and public policy clearly prohibit all other forms of Class III gaming, including the casino gambling activities which the Tribes have sought to include in compact negotiations with the State. The Indian Gaming Regulatory Act does not require that all forms of Class III gaming be included in compact negotiations simply because the

State permits a lottery and pari-mutuel betting.

IT IS FURTHER ORDERED that the Motion to Strike Affidavit of William Thompson, filed by the State of Idaho on July 9, 1993, should be, and is hereby, GRANTED in part and DENIED in part. The motion is granted in that all legal conclusions contained in the affidavit are hereby STRICKEN. The motion is otherwise denied.