968 F.Supp. 531 (1996)
CONFEDERATED TRIBES AND BANDS OF the YAKAMA INDIAN NATION, a Federally Recognized Indian Tribe, Plaintiff,
v.
Mike LOWRY, in His Official Capacity as Governor of the State of Washington, and the State of Washington, a State of the United States of America, Defendants.
No. CY-95-3077-AAM.
United States District Court, E.D. Washington.
December 19, 1996.
Order denying motion for reconsideration February 18, 1997.
*532 Jerome L. Levine, Los Angeles, CA, Mary L. Prevost, Levine & Associates, Seattle, WA, for Plaintiff.
Jonathan T. McCoy, Asst. Atty. Gen., Olympia, WA, for Defendants.

ORDER GRANTING MOTION TO DISMISS
McDONALD, Senior District Judge.
BEFORE THE COURT is the defendants' motion to dismiss (Ct.Rec.23) heard with oral argument on December 16, 1996. Jerome L. Levine, Esq., and Mary Prevost, Esq., appeared on behalf of plaintiff. Jonathan T. McCoy, Assistant Attorney General for the State of Washington, appeared on behalf of defendants.
The defendants move to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(1) (lack of subject matter jurisdiction); 12(b)(2) (lack of personal jurisdiction); and 12(b)(6) (failure to state a claim upon which relief can be granted).

DISCUSSION

I. Failure To State A Claim Upon Which Relief Can Be Granted
A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988). In reviewing a 12(b)(6) motion, the court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from such allegations. Mendocino Environmental Center v. Mendocino County, 14 F.3d 457, 460 (9th Cir.1994); NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir.1986). The sole issue raised by a 12(b)(6) motion is whether the facts pleaded, if established, would support a claim for relief; therefore, no matter how improbable those facts alleged are, they must be accepted as true for purposes of the motion. Neitzke v. Williams, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 1832-33, 104 L.Ed.2d 338 (1989).
Plaintiff's complaint alleges the State of Washington operates its lottery on the Yakama Indian Nation Reservation in violation of the Indian Gaming Regulatory Act, specifically *533 25 U.S.C. § 2710(b)(4) and (d)(1)(A)(ii).[1]
According to plaintiff, the state lottery qualifies as a Class III gaming activity and as such can only lawfully be conducted on Indian lands if it is authorized by an ordinance or resolution that: (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands; (ii) meets the requirements of subsection (b) of this section (§ 2710(b)); and (iii) is approved by the Chairman of the National Indian Gaming Association. 25 U.S.C. § 2710(d)(1)(A). Furthermore, the activity must be located in a State that permits such gaming for any purpose, by any person, organization or entity, and it must be conducted in conformance with a tribal-state compact which is in effect. 25 U.S.C. § 2710(d)(1)(B) and (C).
25 U.S.C. § 2710(b)(4)(A)[2] provides:
A tribal ordinance or resolution may provide for the licensing or regulation of Class II gaming activities owned by any person or entity other than the Indian tribe and conducted on Indian lands, only if the tribal licensing requirements include the requirements described in the subclauses of subparagraph (B)(i) and are at least as restrictive as those established by State law governing similar gaming within the jurisdiction of the State within which such Indian lands are located. No person or entity, other than the Indian tribe, shall be eligible to receive a tribal license to own a Class II gaming activity conducted on Indian lands within the jurisdiction of the Indian tribe if such person or entity would not be eligible to receive a State license to conduct the same activity within the jurisdiction of the State.
25 U.S.C. § 2710(b)(4)(B)(i) provides:
The provisions of subparagraph (A) ... shall not bar the continued operation of an individually owned Class II gaming operation that was operating on September 1, 1986, if 
(I) such gaming operation is licensed and regulated by an Indian tribe pursuant to an ordinance reviewed and approved by the [National Indian Gaming] Commission ...
(II) income to the Indian tribe from such gaming is used only for the purposes described in subparagraph (2)(B) of this subsection,
(III) not less than 60 percent of the net revenues is income to the Indian tribe, and
(IV) the owner of such gaming operation pays an appropriate assessment to the National Indian Gaming Commission ... for regulation of such gaming.
Plaintiff contends the State of Washington has failed to procure the license required by 25 U.S.C. § 2710(b)(4)(A) and has failed to comply with the requirements of § 2710(b)(4)(B), in particular the payment of net revenues to the plaintiff. Plaintiff seeks: 1) damages in an amount yet to be determined, but in excess of one million dollars; and 2) imposition of a constructive trust on the State's funds for the benefit of the Yakama Nation to the extent such funds represent 60% of the net profits derived by the State from its gambling activities on the Yakama Reservation, and for an accounting of all such activities and of all funds derived therefrom, since those activities began.
Although the IGRA clearly refers to gaming activity by non-tribal persons or entities (i.e. 25 U.S.C. § 2710(b)(4)(A)), there is no specific reference to gaming activity conducted by States. IGRA's legislative history is similarly devoid of any specific reference to gaming activity conducted by States. 5 U.S.Code Cong. and Adm. News, at pp. 3071 et seq. The plaintiff concedes as much, but contends this is inconsequential because IGRA's reference to non-tribal persons or entities is intended to include States.
In Coeur d'Alene Tribe v. State of Idaho, 842 F.Supp. 1268, 1282 (D.Idaho 1994), affirmed, *534 51 F.3d 876 (9th Cir.1995), the Idaho district court concluded it was "obvious" that a state lottery is a Class III gaming activity subject to IGRA's provisions regarding such activity.[3] Because it was undisputed there was no Nez Perce resolution authorizing Class III gaming activity on the Nez Perce Reservation, nor was there a compact between the State and the Nez Perce tribe authorizing such activity, the Idaho district court found that neither the tribe nor any non-tribal entity, including the State of Idaho, could conduct Class III gaming on the reservation.
In a very brief opinion, the Ninth Circuit affirmed the Idaho district court "substantially for the reasoning advanced" by the district court. The circuit's only substantive comment was that "[B]ecause Idaho does not permit Class Ill gaming activities, we hold that the Coeur d' Alene Tribe has no right to engage in those activities." It appears the circuit, at least tacitly, disagreed with the district court's determination that the Idaho State lottery is a Class III gaming activity. Furthermore, there is nothing in the circuit's opinion explicitly affirming the Idaho district court's opinion that state lotteries are subject to IGRA's regulatory provisions. Accordingly, Coeur d'Alene has no precedential impact insofar as this court's determination of whether the plaintiff has stated a claim upon which relief can be granted. This court is not bound by the Idaho district court opinion.
There are two reasons which persuade the court that Congress did not intend IGRA to apply to State-operated gaming activity. First and foremost is that the State is not just any non-tribal entity. The State is a sovereign entity. In addition to seeking dismissal of plaintiff's complaint on the basis of Fed.R.Civ.P. 12(b)(6), the defendants seek dismissal on the basis of the 11th Amendment which prohibits the exercise of federal jurisdiction over suits against unconsenting States.[4] The 11th Amendment is a jurisdictional issue, and therefore technically distinct from whether plaintiff's complaint states a claim upon which relief can be granted. However, if Congress did not abrogate the States' 11th Amendment immunity through the IGRA, or condition the States' participation in the IGRA on a waiver of such immunity, it is probable Congress did not intend that State-operated gaming activity would be subject to IGRA's regulatory provisions.
25 U.S.C. § 2710(d)(7)(A)(i) provides United States district courts with jurisdiction over any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the tribe for the purpose of entering into a compact or to conduct such negotiations in good faith. 25 U.S.C. § 2710(d)(7)(A)(ii) provides jurisdiction over any cause of action initiated by a State or Indian tribe to enjoin a Class III gaming activity located on Indian lands and conducted in violation of any tribal-state compact that is in effect.
"Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." Seminole Tribe of Florida v. Florida, ___ U.S. ___, ___, 116 S.Ct. 1114, 1123, 134 L.Ed.2d 252 (1996) quoting Dellmuth v. Muth, 491 U.S. 223, 227-28, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181. Seminole involved a suit by the Seminole Tribe against the State of Florida and its Governor for an alleged failure to negotiate a tribal-state compact in good faith.[5] The Supreme Court found the *535 IGRA was "unmistakably clear" in its intent to abrogate the States' immunity and make them subject to suit in federal court for failure to enter into negotiations for a tribal-state compact or to conduct such negotiations in good faith. Congress clearly intended to abrogate the sovereign immunity of the States pursuant to 25 U.S.C. § 2710(d)(7)(A)(i). Id. at ___, 116 S.Ct. at 1124. Nonetheless, the Court concluded Congress had passed § 2710(d)(7) through an invalid exercise of power. In other words, Congress did not have the power to abrogate the states' immunity. According to the Court, "[E]ven when the Constitution vests in Congress complete law-making authority over a particular area (such as regulation of Indian commerce pursuant to the Indian Commerce Clause), the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." Id. at ___, 116 S.Ct. at 1131.
25 U.S.C. § 2710(d)(7)(A)(i) is not at issue in the instant case since the parties have successfully negotiated a tribal-state compact. Rather, it is 25 U.S.C. § 2710(d)(7)(A)(ii) which provides the only conceivable authorization for plaintiff's claim.[6] Whereas it is "unmistakably clear" that Congress intended to authorize suits against the States for their failure to enter into and conduct good faith negotiations to form tribal-state compacts, it is not "unmistakably clear" that 25 U.S.C. § 2710(d)(7)(A)(ii) was intended to authorize suits against States to enjoin gaming activity conducted by States on Indian lands. This court has already noted the absence of any specific reference to State-operated gaming activity in the IGRA or its legislative history.[7]
Plaintiff contends the State of Washington has impliedly or constructively waived its 11th Amendment immunity because it operates its lottery within the boundaries of the Yakama Indian Nation Reservation and therefore, has willingly subjected itself to IGRA's regulatory provisions. The test for an implied waiver of 11th Amendment immunity is the same as for determining whether Congress has abrogated such immunity. There must be "unmistakably clear language" in the federal statute which conditions state participation on a waiver of sovereign immunity. Welch v. Texas Dept. of Highways and Public Transp., 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987).
At issue in Welch was the Jones Act. The Supreme Court found Congress had not expressed in unmistakable statutory language its intention to allow States to be sued in federal court under the Jones Act, notwithstanding a provision that the Act extended to "any seaman who shall suffer personal injury in the course of employment." According to the Court, the constitutional role of the States "sets them apart from other employers and defendants." Id. at 475-77, 107 S.Ct. at 2947-48.
There is no "unmistakably clear" language in the IGRA that its regulatory provisions apply to State-operated gaming activity. Unsurprisingly then, there is no "unmistakably clear" language that the State can be sued in federal court for conducting such activity outside IGRA's regulatory provisions.[8]
*536 In sum, if Congress did not explicitly authorize a suit against States for failure to comply with IGRA's regulatory provisions, it is extremely doubtful that Congress intended those provisions to apply to State-operated gaming activity on Indian lands. If Congress did so intend, it is difficult to comprehend why the tribe was not afforded the explicit remedial mechanism necessary to enforce those provisions against the State and effectuate a waiver of the States' 11th Amendment immunity.[9]
Secondly, IGRA's regulatory scheme appears inconsistent with an intent to regulate State-operated gaming activity. IGRA provides for the application of State standards and/or State regulation with regard to Class II and Class III gaming activity conducted on Indian lands. These provisions strongly suggest Congress' concern was with gaming activity conducted by the tribes themselves, and gaming activity conducted by non-tribal entities, other than the states. For example, one of the requirements for allowing Class II and III gaming activities on Indian lands is that the State "permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(b)(1)(A) and (d)(1)(B). Class II and III gaming activity can be licensed by the tribe so long as the tribe's licensing requirements are at least as restrictive as those established by State law. 25 U.S.C. § 2710(b)(4)(A). Provisions which may be included in a tribal-state compact regarding Class III gaming activity include those relating to the application of the criminal and civil laws and regulations of the tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity; the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations; and the assessment by the State of such activities in such amounts as are necessary for defraying the costs of regulating such activity. 25 U.S.C. § 2710(d)(3)(C)(i)(ii) and (iii). All of these provisions reveal Congress' recognition of a State's interest in regulating certain types of gaming activity wherever conducted within its boundaries.
The policies behind the IGRA include providing a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong governments; and providing a statutory basis for regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the tribe is the primary beneficiary of the gaming operation, and to assure the gaming is conducted fairly and honestly by both the operator and players. 25 U.S.C. § 2702(1) and (2).
These policy concerns are not implicated by State-operated gaming activity to the same extent as by gaming activity conducted by other non-tribal entities Obviously, State standards and regulations govern the operation of the state lottery. Presumably, the state lottery, unlike gaming activity conducted by other non-tribal entities, is much less susceptible to the corrupting influence of organized crime which Congress especially feared in regard to Indian gaming activity.
It is not readily apparent that the operation of the state lottery on the Yakama Reservation imposes any type of economic burden upon the tribe. On the contrary, state lottery revenues are intended to benefit in some manner all of the state's residents  tribal or non-tribal. The Yakama Nation is not intended to be the "primary" beneficiary of the state lottery. The court fails to see how operation of the state lottery outside of IGRA's provisions (including the revenue sharing provision) frustrates or is inconsistent with the economic objectives of the statute.
*537 The plaintiff notes that IGRA was intended to preempt the field in the governing of gaming activities on Indian lands. 5 U.S.Code Cong. and Adm. News, p. 3076. Thus, plaintiff contends the Washington Lottery Act is a violation of federal law and in turn, a violation of the Supremacy Clause. However, the Supremacy Clause is not the source of any federal rights. It merely secures federal rights by according them priority when they come in conflict with state law. Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107, 110 S.Ct. 444, 449, 107 L.Ed.2d 420 (1989) (citations omitted). Plaintiff contends it could amend its complaint to allege a claim under 42 U.S.C. § 1983 and that the court could imply a cause of action under the IGRA itself. 42 U.S.C. § 1983 provides a federal remedy for the deprivation of federal constitutional and federal statutory rights. Id. at 105, 110 S.Ct. at 447-48. 42 U.S.C. § 1983 does not itself create any substantive federal constitutional or statutory rights. Like the Supremacy Clause, it is merely a remedial mechanism for vindicating any established federal constitutional or statutory right.[10] Plaintiff has failed to prove it has an established federal statutory right to enjoin the State's lottery.[11]
Where a statute fails to expressly provide a remedy, a court may find that such a remedy is implicit in the statute. Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88, 45 L.Ed.2d 26 (1975). Here again, however, the issue is one of remedy versus substantive federal right. Because the IGRA does not confer a substantive federal right with regard to the operation of state lotteries on Indian lands, the existence of a remedy is not an issue.

II. Jurisdiction
Because the IGRA does not provide plaintiff with a cause of action, this court lacks subject matter jurisdiction. There is no federal question under 28 U.S.C. § 1331 or § 1362.[12]
Although it is not strictly necessary to determine whether the State of Washington is entitled to 11th Amendment immunity from suit in federal court, it is clear from the discussion above that the State is entitled to such immunity. Because the IGRA does not provide a cause of action against the State, there is likewise no cause of action against the Governor in his official capacity. The court need not determine whether the Governor is entitled to 11th Amendment immunity.[13]

CONCLUSION
Congress has the plenary power to regulate Indian affairs and commerce. U.S. Const. art 1, § 8, cl. 3. One of the Congressional findings in passing the IGRA was that tribes have "the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). Nonetheless, unless Congress specifically says the States' gaming activity is included, States are not subject to IGRA's regulatory provisions.
IT IS HEREBY ORDERED:
1. Plaintiff's first and third cause of actions set forth in the complaint are DISMISSED as moot.
*538 2. Defendant's Motion to Dismiss (Ct. Rec.23) is GRANTED.
3. Plaintiff's second cause of action (the lottery claim) is DISMISSED with prejudice because it fails to state a claim upon which relief can be granted. Accordingly, plaintiff's complaint is DISMISSED in its entirety.
IT IS SO ORDERED.
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION, a Federally Recognized Indian Tribe, Plaintiff,

vs.
GARY LOCKE[1], in His Official Capacity as Governor of the State of Washington, and the STATE OF WASHINGTON, a State of the United States of America, Defendants.

ORDER DENYING MOTION FOR RECONSIDERATION
BEFORE THE COURT is the defendants' motion for reconsideration (Ct.Rec.31) heard without oral argument on February 3, 1 997. Jerome L. Levine, Esq., and Mary Prevost, Esq., appeared on behalf of plaintiff. Jonathan T. McCoy, Assistant Attorney General for the State of Washington, appeared on behalf of defendants.
On December 19, 1996, this court entered an order dismissing the plaintiff's complaint in its entirety. The specific claim at issue was plaintiff's assertion that the State of Washington operates its lottery on the Yakama Indian Nation Reservation in violation of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2710(d)(3)(A) and (d)(7)(A)(i). This court found IGRA did not apply to the state lottery and dismissed plaintiff's claim pursuant to 12(b)(6) (failure to state a claim upon which relief can be granted).
Motions for reconsideration serve a limited function. "`[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Pyramid Lake Paiute Tribe v. Hodel, 882 F.2d 364, 369 n. 5 (9th Cir.1989) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478, at 790); see Frederick S. Wyle Professional Corp. v. Texaco, Inc., 764 F.2d 604, 609 (9th Cir.1985); see also Keene Corp. v. International Fidelity Ins. Co., 561 F.Supp. 656, 665 (N.D.Ill. 1982) (reconsideration available "to correct manifest errors of law or fact or to present newly discovered evidence.").
Plaintiff alleges the court's order of dismissal is premised on "several clear errors."

DISCUSSION

A. Wilder Test
Plaintiff contends this court failed to apply appropriate Supreme Court and Ninth Circuit legal standards for determining whether IGRA creates enforceable rights in favor of Indian tribes with respect to state-operated gambling on Indian lands. According to plaintiff, when those standards are applied, it is apparent the IGRA creates enforceable rights on behalf of plaintiff and other tribes to assure they have the paramount right to regulate and benefit from gaming on Indian lands.
Plaintiff cites Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), a case which plaintiff did not cite in its response to defendant's motion to dismiss. Wilder involved a 42 U.S.C. § 1983 action by a nonprofit corporation composed of public and private hospitals against Virginia state officials. The plaintiff alleged a Virginia state plan violated the Medicaid Act and the Boren Amendment to that Act. Defendant state officials claimed § 1983 did not afford the plaintiff a cause of action. The Supreme Court found the Boren Amendment was enforceable in a § 1983 action for declaratory and injunctive relief.
§ 1983 provides a cause of action for violations of federal statutes as well as the Constitution. There are two exceptions to this rule. A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless: (1) the statute does not create enforceable rights, privileges or immunities within the meaning of § 1983 or (2) Congress *539 has foreclosed such enforcement of the statute in the enactment itself. Wilder, 496 U.S. at 508, 110 S.Ct. at 2516-17.
In Wilder, the Court found the Boren Amendment created a "federal right" enforceable under § 1983 because: 1) the Amendment was intended to benefit the putative plaintiff, 2) created a binding obligation on the Virginia state government, and 3) the interest asserted by the plaintiff was not too vague and amorphous such that it could not be enforced by the judiciary. Id. at 509-20, 110 S.Ct. at 2517-23. The Court also found Congress had not foreclosed enforcement of the Medicaid Act under § 1983 because there was not an express provision in the Act precluding resort to § 1983, and the Act did not create a remedial scheme sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983. Id. at 520-24, 110 S.Ct. at 2523-25.
Based on Wilder, plaintiff asserts the IGRA "unequivocally" articulates the Tribe's "exclusive right to regulate all gaming on Indian lands, as well as numerous tribal interests which flow not only from regulation but also from the revenues generated from gaming on Indian lands."
It must first be pointed out that plaintiff's complaint did not assert § 1983 as a basis for any cause of action. Rather, the complaint was premised exclusively on the IGRA and sought a remedy based on the specific provisions of IGRA  not on § 1983. The plaintiff previously asserted it should be allowed to amend its complaint to state a § 1983 claim. In the order of dismissal, this court noted that § 1983 is a remedial mechanism and does not itself create any substantive federal constitutional or statutory right. Because this court found that plaintiff had failed to prove it had an established federal statutory right to enjoin the state lottery, this court likewise found that plaintiff could not assert a claim pursuant to § 1983.
Wilder is wholly consistent with this court's analysis. Wilder simply recognizes that for there to be a § 1983 action, the law in question must confer an enforceable right. In Suter v. Artist M., 503 U.S. 347, 357, 112 S.Ct. 1360, 1366-67, 118 L.Ed.2d 1 (1992), the Supreme Court emphasized that the law in question must "unambiguously" confer an enforceable right. In Buckley v. City of Redding, 66 F.3d 188, 191 (9th Cir.1995), the Ninth Circuit concluded Suter had minimal impact on the analytic framework for determining whether a § 1983 action may be brought and thus:
The nature of the section 1983 remedy remains broad and may be used to remedy infringement of any unambiguously conferred right, privilege, or immunity, so long as Congress has not foreclosed use of the remedy explicitly, or implicitly by imbuing the act in question with its own comprehensive remedial scheme.
See also Freestone v. Cowan, 68 F.3d 1141, 1148 (9th Cir.1995) (Suter represents an elaboration and amplification of the Wilder test rather than an unannounced and unacknowledged departure).[2]
Plaintiff cites to several provisions of IGRA which it contends manifest Congressional intent to regulate "all" gaming activity on Indian lands, including state-operated gaming activity. Congress has found that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). However, § 2701(5) does not explicitly state "all" forms of gaming activity are covered. One of the purposes of the IGRA is to establish "Federal standards for gaming on Indian lands." 25 U.S.C. § 2702(3). § 2702(3) does not explicitly state "all" gaming on Indian lands.
Furthermore, a review of other provisions of the IGRA and the legislative history of the *540 IGRA, raise doubt whether Congress intended the IGRA to apply to state-operated gaming activity, such as the state lottery. The sovereign status of the States and their 11th Amendment immunity contribute to such doubt.
The purpose of the IGRA is: (1) to provide a statutory basis for the operation of "gaming by Indian tribes" as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; and (2) to provide a statutory basis for the regulation of "gaming by an Indian tribe" adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure the gaming is conducted fairly and honestly by both the operator and the players. 25 U.S.C. § 2702(1) and (2). The state lottery is assuredly not "gaming by an Indian tribe."
In its order to dismiss, this court took notice of certain provisions in the IGRA such as § 2710(b)(4)(A) which states that "a tribal ordinance or resolution may provide for the licensing or regulation of ... gaming activities owned by any person or entity other than the Indian tribe and conducted on Indian lands." However, this court also observed: 1) that the IGRA and its legislative history are devoid of any specific reference to state-operated gaming activity; and 2) that the State is a sovereign entity and not just any non-tribal entity. Furthermore, the provision authorizing the tribes to regulate Class II and Class III gaming activity specifically refers to "Indian gaming." § 2710(b)(1) provides that an Indian tribe may engage in, or license and regulate Class II and Class III gaming activity if "such Indian gaming" is located within a State that permits such gaming for any purpose by any person, organization, or entity and such gaming is not otherwise specifically prohibited on Indian lands by federal law.
When one looks at the statute and its legislative history as a whole, the IGRA does not "unambiguously" confer a right upon Indian tribes to regulate, license, derive profits from, or enjoin the operation of a state's lottery. Thus, although as a general matter the IGRA is designed to benefit tribes, that benefit does not extend to taking a portion of the revenue derived from the operation of the state lottery on Indian lands.
The only express "binding obligation" created by the IGRA on a State is to negotiate in good faith with the tribes to achieve compacts regarding Class III gaming activity. 25 U.S.C. § 2710(d)(3)(A). In Seminole Tribe of Florida v. Florida, ___ U.S. ___, ___, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996), the U.S. Supreme Court found this statutory obligation could not be enforced against States in federal court because Congress, despite its plenary power over Indian affairs, was not authorized to abrogate the 11th Amendment immunity of the States.
There is not an express provision in the IGRA precluding resort to § 1983 as a remedy. On the other hand, the Supreme Court in Seminole expressly observed that Congress had created an "intricate" remedial scheme for violations of the IGRA. ___ U.S. at ___-___, 116 S.Ct. at 1132-33. This remedial scheme is sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983. Because of the "intricate" remedial scheme of IGRA[3], the Supreme Court in Seminole found the 11th Amendment also barred a federal court action against the Governor of the State of Florida seeking to compel him to negotiate a compact with the Seminole tribe.
Application of the Wilder test does not alter the outcome in this case because the IGRA does not "unambiguously" create an enforceable right for tribes to regulate state-operated gambling activity on Indian lands.

B. Preemption
Plaintiff contends this court's search for express statutory language making IGRA applicable to state activities on Indian lands was unnecessary, "since it appears based on the assumption that state law applies on the *541 reservation unless Congress expressly provides otherwise." According to plaintiff, the reverse is true, citing language in the legislative history of IGRA recognizing the "long and well-established principle of Federal-Indian law that ... unless authorized by an act of Congress, the jurisdiction of the State governments and the application of state laws do not extend to Indian lands." 1988 U.S.Code Cong. and Adm. News at p. 3075. Plaintiff contends the IGRA does not expressly authorize the State to conduct its lottery on the reservation. According to plaintiff: "Given that IGRA preempts the application of the state's gaming laws on the reservation, the state lottery is operating without any source of legal authority."
There is no doubt the IGRA preempts the application of state gaming laws regarding gaming activity conducted by Indian tribes. The Select Committee on Indian Affairs stated the IGRA represents:
... a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities.
1988 U.S.Code Cong. and Adm. News at p. 3075.
A thorough scouring of IGRA's legislative history makes it clear IGRA was intended to regulate Indian gaming activity  either tribally owned operations or "individually-owned and operated" gaming activity on Indian lands, the purpose of which is "profit to the owner(s) of Indian trust lands." Id. at p. 3088. According to the legislative history, 25 U.S.C. § 2710(b)(4)(A) and (B) which refer to the licensing or regulation of gaming activities owned by "any person or entity" other than the Indian tribe, deals with such "individually owned and operated" games.[4] The State of Washington is neither an "individual" or, as far as the court is aware, an "owner of Indian trust lands."
Case law has recognized the purpose of the IGRA is to regulate Indian gaming activity. According to Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 544 (8th Cir.1996):
Examination of the text and structure of IGRA, its legislative history, and its jurisdictional framework likewise indicate Congress intended it to completely preempt state law. There is a comprehensive treatment of the issues affecting the regulation of Indian gaming activity.
(Emphasis added).
Congress has plenary power over Indian affairs. If Congress wanted to completely exclude application of state gambling laws to Indian lands, it seems it could do so. However, Congress has not so chosen. 18 U.S.C. § 1166(a) provides:
Subject to subsection (c), for the purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.
(Emphasis added). Subsection (c) states the term "gambling" does not include: (1) Class I gaming or Class II gaming regulated by the IGRA; or (2) Class III gaming conducted under a Tribal-State compact.[5]
Among the state laws pertaining to the "licensing, regulation, or prohibition of gambling" is the Washington Lottery Act, RCW 67.70. As plaintiff notes, the state lottery is exempted from the general criminal prohibition against the conducting of lotteries. RCW 9.46.291. The Washington Lottery Act is therefore applicable on the Yakama Nation Reservation, unless it is Class I or Class II gaming regulated by the IGRA or Class III gaming conducted under a tribal-state compact. As stated above, the legislative *542 history of IGRA suggests the intent of Congress was to regulate Indian gaming activity  tribally owned activity, or individually owned and operated activity conducted on Indian trust lands  not the state lottery.
Under the IGRA, Class I gaming activity is within the "exclusive" jurisdiction of Indian tribes. 25 U.S.C. § 2710(a)(1). Class I gaming activity means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). The Washington State Lottery is clearly not Class I gaming activity under IGRA's definition.
Class II gaming activity means the game of chance commonly known as bingo "including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other similar games to bingo." Class II gaming activity also includes card games. 25 U.S.C. § 2703(7). The tribe may engage in, or license and regulate, Class II gaming on Indian lands so long as "such Indian gaming" is located within a State that permits such gaming and such gaming is not prohibited by federal law; and the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman of the National Indian Gaming Commission. 25 U.S.C. § 2710(b)(1).
The plaintiff does not assert the state lottery is Class II gaming activity, nor could it based on IGRA's definitions. See Spokane Indian Tribe v. U.S., 972 F.2d 1090, 1094-95 (9th Cir.1992). The state lottery is not "Indian gaming" and is not an integral part of an Indian bingo enterprise. 1988 U.S.Code Cong. and Adm. News at p. 3079.
The plaintiff does assert the state lottery is Class III gaming activity. Class III gaming means all forms of gaming that are not Class I gaming or Class II gaming. 25 U.S.C. § 2703(8). Class III gaming activities are lawful on Indian lands only if they are authorized by tribal ordinance or resolution; located in a State that permits such gaming for any purpose by any person, organization, or entity; and conducted in conformance with a tribal-state compact. 25 U.S.C. § 2710(d)(1).
The legislative history indicates 25 U.S.C. § 2710(d)(1) was intended to cover the tribe's Class III gaming activity, not the state's gaming activity. Congress concluded "that the use of compacts between tribes and the states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises such as pari-mutuel horse and dog racing, casino gaming, jai alai and so forth." It was Congress' intent that the compact requirement for Class III gaming activity "not be used as justification by the State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free-market competition with Indian tribes." 1988 U.S.Code Cong. and Adm. News at p. 3083. Congress recognized a need to provide some incentive for States to negotiate with the tribes in good faith "because tribes will be unable to enter into such gaming unless a compact is in place." The incentive is application of state regulation through negotiated compacts. Id. at pp. 3083-84. IGRA allows the tribe to sue the State if compact negotiations are not concluded. 25 U.S.C. § 2710(d)(7)(A)(i). This provision is the result of "balancing the interests and rights of tribes to engage in gaming against the interests of States in regulating such gaming." Id. at 3084.
It appears that if a State so desired, it could compact with an Indian tribe regarding the operation of the state lottery on Indian land. One of plaintiff's claims was that defendant had failed to negotiate in good faith for a compact to regulate the operation of the Washington State Lottery on the Yakama Indian Nation Reservation. Because the parties successfully negotiated a tribal-state compact, the plaintiff did not oppose dismissal of this claim.[6] However, there is nothing in this record indicating the compact covered anything other than the Yakamas' intended Class III gaming activity. In other words, there is no indication the State of Washington voluntarily subjected its lottery to the *543 requirements of 25 U.S.C. § 2710(d), one of which is approval by tribal ordinance or resolution, and payment of 60 percent net revenues to the tribe.
Under the IGRA, Indian tribes are required to give up any legal right they may now have to engage in Class III gaming if they choose to forgo gaming rather than opt for a compact that may involve State jurisdiction; or they opt for a compact, but one is not successfully negotiated. "In contrast, States are not required to forgo any State governmental rights to engage in or regulate Class III gaming except whatever they may voluntarily cede to a tribe under a compact." 1988 U.S.Code Cong. and Adm. News at p. 3084.
Although it is conceivable a State could, pursuant to compact, allow its lottery to be treated as Class III gaming activity under the IGRA, it is not required to do so. The fact it does not so compact, does not preclude it from continuing to operate its lottery on the reservation. The operation of the lottery is authorized pursuant to 18 U.S.C. § 1166(a). The state lottery is neither Class I gaming or Class II gaming regulated by the IGRA. There is no indication in this case that it is "Class III gaming conducted under a tribal-state compact." 18 U.S.C. § 1166(c).
This court does not need to assume that state gambling laws, including the Washington Lottery Act, apply to Indian reservations. Congress has specifically stated that they do, subject to certain delineated exceptions. None of those exceptions appear to apply to the Washington State Lottery.

C. Policy Considerations
In its order of dismissal, this court stated the policy concerns of IGRA are not implicated by state-operated gaming activity to the same extent as by gaming activity conducted by other non-tribal entities. One of the policy concerns is providing a statutory basis for the "operation of gaming by Indian tribes" as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments. 25 U.S.C. § 2702(1). This court stated that it was not readily apparent that the operation of the state lottery on the Yakama Reservation imposes any type of economic burden on the tribe. Furthermore, the court concluded the tribe was not intended to be the "primary beneficiary" of the state lottery. 25 U.S.C. § 2702(2) indicates another purpose of the IGRA is to ensure that the Indian tribe is the primary beneficiary of the gaming operation.
Plaintiff asserts that its complaint alleges economic harm and pursuant to Rule 12(b)(6) the court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from such allegations. As such, plaintiff contends it was inappropriate for the court to speculate about the existence of economic harm to the plaintiff. Plaintiff contends Cabazon Band of Mission Indians v. Wilson, 37 F.3d 430 (9th Cir.1994) "highlights the nature of the court's error."
In Cabazon, the Ninth Circuit found the imposition of a State license fee on simulcast wagering (offtrack betting) conducted on an Indian reservation was inconsistent with IGRA's objective to ensure that Indian tribes are the primary beneficiaries of gaming operations. The Ninth Circuit also found that the licensing scheme undermined tribal interests by economically burdening them. Id. at 433-34.
Southern California Off Track Wagering, Inc. (SCOTWINC), "a quasi-governmental organization of racing associations formed under California law," was responsible for accepting the wagers and handling the cash at the tribes' simulcast wagering facilities. Pursuant to the tribal-state compact, SCOTWINC would distribute a percentage of the wagered money to the tribes and would remit the license fee to the state which was also a specified percentage of all wagers placed.
The Ninth Circuit found that federal and tribal interests outweighed the state interests. The state had an extensive regulatory scheme for the offtrack betting and expended funds to regulate the activity. However, the negotiated tribal-state compacts provided a means by which the state could recoup its costs outside of the state tax structure. Id. at 435.
*544 Cabazon did not involve state-operated gaming activity, such as the state lottery. Indeed, the Ninth Circuit recognized this: "[T]he State benefited from the tribal gaming operation to a considerably greater extent than the Bands." 37 F.3d at 433. This clearly contravened IGRA's objective of ensuring that the Indian tribe is the "primary beneficiary" of "gaming by an Indian tribe." 25 U.S.C. § 2702(1). Furthermore, in Cabazon, state law did not control because there was a compact between the state and the tribe. The terms of the compact were controlling and thus, the state was not entitled to collect its licensing fees pursuant to state law. Id. at 434. In the case before this court, there is no compact controlling the operation of the state lottery on the Yakama Nation Reservation.
In balancing federal, tribal, and state interests, no specific congressional intent to preempt state activity is required. It is enough if the state law conflicts with the purpose or operation of a federal statute or policy. Id. at 433. (citation omitted). The operation of the state lottery on the Yakama Reservation does not conflict with the IGRA because the IGRA is intended to ensure the tribe is the primary beneficiary of tribal gaming operations  not state-operated gaming operations.[7]

D. Coeur d'Alene Case
In its memorandum opposing the defendant's motion to dismiss, the plaintiff made but a passing reference to Coeur d'Alene Tribe v. State of Idaho, 842 F.Supp. 1268 (D.Idaho 1994), affirmed, 51 F.3d 876 (9th Cir.1995). However, in its motion for reconsideration, plaintiff vociferously asserts that Coeur d'Alene compels this court to find the state lottery cannot be operated on the Yakama Reservation absent a tribal ordinance and the payment to the tribe of 60% of the revenue generated by the lottery on the reservation.
In Coeur d'Alene, the Idaho district court concluded it was "obvious" that a state lottery is Class III gaming activity subject to IGRA's provisions regarding such activity. Because it was undisputed there was no Nez Perce resolution authorizing Class III gaming activity on the Nez Perce Reservation, nor was there a compact between the State and the Nez Perce tribe authorizing such activity, the Idaho district court found that neither the tribe nor any non-tribal entity, including the State of Idaho, could conduct Class III gaming on the reservation. 842 F.Supp. at 1282.
In a very brief opinion, the Ninth Circuit affirmed the Idaho district court "substantially for the reasoning advanced" by the district court. The circuit's only substantive comment was that "[B]ecause Idaho does not permit Class III gaming activities, we hold that the Coeur d' Alene Tribe has no right to engage in those activities." 51 F.3d at 876.
In the order of dismissal, this court opined that it appeared the circuit, at least tacitly, disagreed with the Idaho district court's determination that the Idaho State lottery is Class III gaming activity. Furthermore, this court noted there was nothing in the circuit's decision explicitly affirming the Idaho district court's opinion that the Idaho State Lottery was subject to IGRA and could not be operated on an Indian reservation absent a tribal ordinance and a tribal-state compact. Accordingly, this court concluded Coeur d'Alene had no precedential impact insofar as this court's determination of whether the plaintiff had stated a claim upon which relief could be granted.
Plaintiff contends this court erred in reaching this conclusion. Plaintiff contends the question of IGRA's application to a state lottery was presented and necessarily decided in the Ninth Circuit's decision in Coeur d'Alene. This is untrue.
The Idaho district court decision concerning the state lottery was restricted to the Nez Perce Tribe and the Nez Perce Reservation. The state lottery had a total of 32 outlets at various locations in the Nez Perce Reservation, but it was "unclear from the record" whether the state lottery was conducted *545 on the Coeur d' Alene and Kootenai Reservations. 842 F.Supp. at 1282. The Ninth Circuit appeal was taken only by the Coeur d' Alene Tribe. The state lottery was not an issue as to the Coeur d' Alene Tribe. Accordingly, the Ninth Circuit did not rule on the district court decision finding that Idaho could not operate its lottery on the Nez Perce Reservation in the absence of a tribal gaming ordinance and a tribal-state compact.
Clearly, there is no binding Ninth Circuit authority. The Idaho district court decision is not binding on this court. For reasons set forth in the its previous order, as well as this order, the court finds IGRA does not prohibit the operation of the state lottery on an Indian reservation.
Plaintiff asserts that in Spokane Indian Tribe v. U.S., 972 F.2d 1090 (9th Cir.1992), the Ninth Circuit "expressly held that Washington's state lottery is a Class III gaming activity." This is false. At issue in the Spokane case was a "Pick Six" lotto game operated by the tribe. The Ninth Circuit determined the game was not a Class II gaming activity. It noted the legislative history made it clear the term "lotto" used in the definition of Class II gaming activity was not synonymous with "lottery," and that "Indian tribes could not operate a statewide lottery without a tribal-state compact." Id. at 1094-95. The Spokane case has absolutely nothing to do with the application of IGRA to the Washington State Lottery. None of the other cases cited by plaintiff have anything to do with the application of IGRA to state lotteries or any other state-operated gaming activity. These cases deal only with tribal gaming operations.

E. Amendment of Complaint
Plaintiff contends that rather than dismissing its complaint with prejudice, the court should grant it leave to amend. Plaintiff acknowledges that leave to amend may be denied if the amendment is futile. A proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense. Miller v. Rykoff-Sexton Inc., 845 F.2d 209, 214 (9th Cir.1988) (citations omitted).
According to plaintiff, even if the court adheres to its view that IGRA does not create "enforceable" rights in the tribe against the state, the plaintiff should be allowed to seek prospective equitable relief, including a declaration, that the IGRA preempts the operation of the state lottery on the reservation absent a tribal ordinance and a tribal-state compact. For reasons set forth above, it is clear the IGRA does not preempt the operation of the state lottery on the reservation. IGRA does not create any right (enforceable or unenforceable) in the plaintiff to enjoin the operation of the state lottery on the Yakama Nation Reservation. As such, the Supremacy Clause is of no avail to plaintiff because it is not the source of any federal rights, but merely secures such rights when they come in conflict with state law. Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107, 110 S.Ct. 444, 449, 107 L.Ed.2d 420 (1989) (citations omitted). The Washington Lottery Act does not conflict with the IGRA. Plaintiff's proposed amendment of the complaint would be futile. Dismissal with prejudice was and remains appropriate.

CONCLUSION
This court has not committed "clear" error such as would warrant reconsideration of its order of dismissal.
Accordingly, plaintiff's motion for reconsideration (Ct.Rec.31) is DENIED.
IT IS SO ORDERED.
NOTES
[1] This is the only claim from the complaint which is still at issue. Plaintiff acknowledges its remaining claims are moot since the parties have successfully negotiated a tribal-state compact concerning regulation of Class III gaming activity on the Yakama Nation Indian Reservation. 25 U.S.C. § 2710(d)(3)(A) and (d)(7)(A)(i).
[2] § 2710(b) pertains specifically to Class II gaming activity, but is made applicable to Class III gaming activity via § 2710(d)(1)(A)(ii).
[3] Coeur d'Alene is apparently the only case which has confronted head-on the issue of IGRA's applicability to State-operated gaming activity.
[4] The 11th Amendment acts as a bar to federal jurisdiction over state governments when they are sued by anyone other than the federal government or another state. The Supreme Court has held that Indian tribes are among those entities who may not sue unconsenting states in federal court. Blatchford v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).
[5] 25 U.S.C. § 2710(d)(3)(A) provides:

Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.
[6] Nothing in § 2710(d)(7)(A)(ii) refers to damages as an available remedy. It allows the State or the Tribe to initiate a cause of action to "enjoin" a Class III gaming activity located on Indian lands and conducted in violation of any tribal-state compact that is in effect. Clearly, even if the IGRA supplied plaintiff with a cause of action, its prayer for damages would not be authorized.
[7] Even if it was "unmistakably clear" that 25 U.S.C. § 2710(d)(7)(A)(ii) authorizes a suit against a State, as noted, Seminole concludes that Congress did not have the power to enact § 2710(d)(7)(A) in the first place.
[8] In the Coeur d'Alene case, the State of Idaho consented to suit and expressly waived any 11th Amendment objection. 842 F.Supp. at 1271. Thus, Coeur d'Alene did not make an express determination for 11th Amendment purposes whether it was "unmistakably clear" that IGRA intends to subject States to suit for failing to comply with requirements regarding gaming activity conducted by them on Indian lands.
[9] The fact the State of Washington negotiated a compact with the plaintiff does not amount to a constructive waiver. First of all, pursuant to the compact, the State specifically reserved its right to contest the issue before this court. Secondly, there is compelling case law which concludes that a waiver cannot be effected by engaging in the compact negotiations called for by IGRA. Seminole Tribe of Florida v. Florida, 11 F.3d 1016, 1023 (11th Cir.1994); Poarch Band of Creek Indians v. State of Alabama, 776 F.Supp. 550, 557 (S.D.Ala.1991) ("If simply engaging in negotiations is enough to constitute consent, the state was faced with the Hobson's choice of negotiating and consenting to suit or refusing to negotiate and being sued for failure to negotiate").
[10] The Ninth Circuit has not specifically determined whether tribes can bring a cause under the IGRA pursuant to 42 U.S.C. § 1983. Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 538 (9th Cir.1994). The Ninth Circuit has distinguished "power conferring" provisions of federal law from "rights conferring" provisions. The circuit has held that "power conferring" provisions do not create "rights, privileges, or immunities" within the meaning of § 1983. White Mountain Apache Tribe v. Williams, 810 F.2d 844, 850 (9th Cir.1985). The IGRA clearly concerns tribal sovereignty over gaming activity on Indian reservations and as such, appears to be a "power conferring" provision.
[11] The plaintiff has not asserted any federal constitutional claims.
[12] 28 U.S.C. § 1331 gives federal district courts original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States. 28 U.S.C. § 1362 gives federal district courts original jurisdiction in all civil actions, brought by any Indian tribe or band, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.
[13] It is also unnecessary to address the merits of defendant's Tenth Amendment claim.
[1] Gary Locke is substituted for Mike Lowry. The Governor is named as a defendant "in his official capacity." Governor Locke has succeeded Lowry in that capacity. Fed.R.Civ.P. 25(d)(1).
[2] Plaintiff suggests Rule 11 sanctions against defendant are appropriate for defendant's alleged misrepresentation of the impact of the Suter case. Defendant simply cites the Ninth Circuit's exact language contained in Freestone that "some question exists as to whether the analysis in Suter alters the test set forth in Wilder." 68 F.3d at 1147. Defendant does not misrepresent anything about the Wilder case.
[3] § 2710(d)(7)(A)(i) provides the United States district courts with jurisdiction over any cause of action initiated by an Indian tribe arising from the failure of a state to enter into negotiations with the tribe for the purpose of entering into a tribal-state compact or to conduct such negotiations in good faith.
[4] 25 U.S.C. § 2710(b)(4)(A) and (B) are made applicable to Class III gaming activity by 25 U.S.C. § 2710(d)(2)(A).
[5] 18 U.S.C. § 1166 was enacted with the IGRA. U.S. v. E.C. Investments, Inc., 77 F.3d 327, 330 (9th Cir.1996).
[6] In any event, because of Seminole, the plaintiff could no longer pursue that claim in federal court against either the State of Washington or the Governor.
[7] In drafting IGRA, Congress took specific notice of the state's interest in the conduct of Class III gaming, including "its economic interest in raising revenue for its citizens." 1988 U.S.Code Cong. and Adm. News at p. 3083.